Filed 6/12/26  P. v. Shen CA6

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>　　　Plaintiff and Respondent,<br><br>v.<br><br>JASON SHEN et al.,<br><br>　　　Defendants and Appellants. | H051141<br>(Santa Clara County<br>Super. Ct. No. C1775180) |

Defendants Panpan Huang, Jason Shen, and Lin Tao were convicted of multiple offenses including first degree felony murder, robbery, and sex offenses stemming from a string of brothel robberies in Northern California.  On appeal, defendants raise multiple arguments, including that (1) Tao's confession should have been excluded because his waiver under *Miranda v. Arizona* (1966) 384 U.S. 436 (*Miranda*) was invalid; (2) the jury was prejudicially misinstructed on the actual killer theory of first degree felony murder; (3) there is insufficient evidence for Huang's conviction of felony murder as a major participant who acted with reckless indifference to human life; (4) the trial court prejudicially erred in admitting expert testimony on firearm toolmark analysis; (5) the trial court erroneously admitted evidence that Shen possessed automotive oil filters; (6) California's prohibition on semiautomatic pistols with a threaded barrel violates the Second Amendment to the United States Constitution; (7) the trial court exceeded its authority by imposing several restraining orders; and (8) there is a clerical error in Shen's abstract of judgment that requires correction.

We will strike three of the restraining orders as to all the defendants and agree that Shen's abstract of judgment must be corrected. We otherwise affirm the judgments.

## I.  BACKGROUND

### A.  *The Operative Information*

The Santa Clara County District Attorney charged defendants Huang, Shen, and Tao with the following 13 counts: murder (Pen. Code, § 187, subd. (a); count 1)[1] with a robbery-murder special circumstance (§ 190.2, subd. (a)(17)), four counts of second degree robbery (§ 211; counts 2, 9, 10, and 13), three counts of rape by force, violence, duress, menace or fear (§ 261, subd. (a)(2); counts 5, 6, and 11), two counts of sexual penetration by force, violence, duress, menace, or fear of bodily injury (§ 289, subd. (a)(1)(A); counts 7 and 12), and oral copulation by force, violence, duress, menace, or fear (§ 288a, subd. (c)(2); count 8).[2] For the count of murder, it was alleged that each defendant, if not the actual killer, acted with reckless indifference to human life and was a major participant, and as to Tao, it was alleged that he personally and intentionally discharged a firearm causing death (§ 12022.53, subd. (d)). Tao and Shen were charged with possession of an assault weapon (§ 30605, subd. (a); count 3), and Tao alone was charged with assault with a firearm (§ 245, subd. (a)(2); count 4).

### B.  *The Trial*

#### 1.  *The Prosecution's Case*

The prosecution's theory of the case was that Huang and Shen hired Tao and two other accomplices, An Yan and Jun Li, over the social media platform WeChat with promises of a high-paying job recovering money from sex workers. The men traveled to

---

[1] Unspecified statutory references are to the Penal Code.

[2] As to counts 5, 6, 7, 8, 11 and 12, it was alleged that all three defendants engaged in tying or binding the victims (§ 667.61, subd. (b)) and committed sexual offenses against more than one victim (§ 667.61, subd. (e)).

various residential brothels in the San Francisco Bay Area to rob sex workers. During the robbery of a San Jose brothel, Tao fatally shot a man who worked there.

### a. *The Milpitas Incident*

On September 27, 2017, several men rushed into an apartment in Milpitas where S.D. worked as a sex worker. S.D. was bound and shocked with a stun gun; she also felt a gun at her head. The men demanded money from S.D. and raped her. One man used an eggplant to penetrate S.D.'s vagina. S.D. believed there were at least two or three men, and one of them shaved her head. The men took S.D.'s bank card, threatened her for the password, and left with her cell phone as well.

Surveillance videos from the apartment showed a white van entering the parking garage before the incident. Inside the apartment, officers found a clump of hair near the front entrance area, an eggplant, a condom wrapper, and a Bank of America receipt. The receipt had two of Huang's fingerprints, one of Shen's fingerprints, and two of S.D.'s fingerprints. Huang's fingerprint was found on a condom wrapper.

That day, bank records showed that S.D.'s bank card, in addition to being used to withdraw $500, was also used at a 99 Ranch Market in Daly City and at an Apple Store in Palo Alto. Store surveillance video showed Tao, Yan, and Huang inside the 99 Ranch Market and Shen and Jun Li entering the Apple store around the time the card was used.

### b. *The South San Francisco Incident*

On September 27, 2017, Cuiwei Guo went to her apartment because her sublessee (who operated a brothel) reported that the apartment's surveillance video was no longer visible. Guo found two women and two men in restraints, as well as one naked woman who answered the door. One of the women told Guo that she had been sexually assaulted.

### c. *The Fremont Incident*

On September 28, 2017, at a brothel in Fremont, employee Y.W. opened the door for three men. Two of the men went upstairs, and the third man went to the bathroom.

The third man emerged wearing a mask, and one of the other men came downstairs and pointed a gun at Y.W.; Y.W. was then restrained, her eyes covered with a towel.

X.D. was upstairs. One of the men, whom she later identified as Tao hit her in the face, raped her, and forced her to orally copulate him. A man wearing a mask pointed a gun at her and demanded her money before also raping her. A third man, whom X.D. later identified as Jun Li, joined the others in her bedroom. X.D. recalled that Jun Li had visited the brothel before. Jun Li digitally penetrated X.D.'s vagina. At some point, X.D. heard someone yell for Tao to leave, but Tao responded that he had not ejaculated yet.

Although Y.W. recounted that all three men were masked, she identified Yan through a photograph and thought both Jun Li and Tao looked familiar. Surveillance footage near the apartment showed that a white minivan passed near the residence around the time of the robbery.

### d. *The San Jose Incident*

Y.G. managed a brothel with Xingjian Li at an apartment complex in San Jose. On September 28, 2017, Yan arrived at the brothel, and Tao and Jun Li came shortly after with guns. The men restrained Y.G. and Xingjian Li, and Tao kicked Y.G. and struck him with the gun. While the men went to look for money, Xingjian Li was able to free himself and ran. But Y.G. heard a gunshot. The three intruders left, taking suitcases and other items. Y.G. found Xingjian Li lying in the kitchen, injured with an apparent gunshot wound. Y.G. recalled that Shen had visited the day before.

Officers later found a spent casing with a headstamp reading "WIN 9-millimeter luger" near the base of a couch. Xingjian Li was taken to the hospital, where he died from his injury, a single gunshot wound. The wound trajectory was consistent with his being shot while climbing over a pony wall or partition, with his body parallel to the ground.

Surveillance video from that evening showed a white Dodge Caravan minivan turning into the apartment complex's parking garage. Yan, Jun Li, and Tao can be seen

4

near the parking garage. Later that evening, Jun Li, Yan, and Tao can be seen leaving the lower level parking garage; Yan and Jun Li are carrying suitcases and Tao is carrying boxes.

### e. *Additional Investigation*

Officers determined that the five suspects stayed at a Motel 6 in San Jose two days before the Milpitas robbery. Officers also determined that the suspects stayed at a Wyndham hotel in San Jose on September 28, 2017, the night of the San Jose shooting. Surveillance videos from that evening showed a white Dodge Caravan entering the Wyndham hotel parking lot and all five suspects—Huang, Shen, Tao, Jun Li, and Yan—in the hotel lobby carrying luggage consistent with that taken in the San Jose robbery.

The Dodge Caravan was registered to Larry Ding Yue. Yue reported renting the van to Huang three days before the Milpitas robbery.

When police located the Dodge Caravan, they found a black zip tie and a parking pass for the San Jose Wyndham hotel. Huang's semen was found on the third row seat. Two cigarette butts—one matching Huang's DNA—were found in the interior driver's side door. Huang's fingerprints were on the van's steering wheel. Fingerprints of all five suspects were found on the interior side of the van's third-row window.

All five suspects were arrested. In Shen's home, police found live nine-millimeter ammunition, a nine-millimeter Glock pistol, a bag of zip ties, luggage, and (in the same room as the gun) Napa automotive oil filters. The ammunition found in Shen's home matched the headstamp of the gun casing collected from the San Jose incident. Shen's DNA was on the gun's handle.

An expert in firearms analysis and comparison opined that the cartridge collected from the San Jose incident was fired from the gun found at Shen's house. The expert also opined that the same gun fired the bullet that was recovered from Xingjian Li's body. According to the expert, oil filters can be used as a makeshift silencer.

5

### f. *Tao's Statements to Detective Meeker*

Detective Brian Meeker interviewed Tao with the assistance of a Mandarin language interpreter. Tao told Meeker that he had responded to a job advertisement and had communicated with the employer through WeChat. Tao was offered $20,000 to help collect money owed by sex workers and was told the job would take two or three days.

Tao was driven from Los Angeles to San Jose with men he had not met before. Tao was told that he and the other men would be robbing and taking the money from the sex workers by force. Tao and the others visited seven brothels and used a taser at some of them. Several of the men had guns, and Tao was given one before the San Jose robbery.

When Tao and his accomplices arrived at the San Jose brothel, Tao and one of his accomplices drew their guns, and two men who worked at the brothel were restrained. While Tao and another accomplice went to another room and tied up the sex workers, one of the men broke free and tried to flee. Tao warned him not to move, raising his gun and firing it once. The man said he would not run anymore, and Tao tied him up again, then left with his accomplices and luggage from the brothel.

### g. *Yan's Testimony*

Yan testified for the prosecution pursuant to a plea agreement. Yan identified defendants Huang, Tao, and Shen at trial as his coparticipants. He identified Jun Li as one of the four other men by photograph. At the time of the offenses, Yan had recently moved from China to Southern California. Yan contacted Huang over WeChat after Huang posted about a job that had good pay. Yan later met Huang and Shen in person: They discussed Yan's prior military and police experience, and Huang said he was looking for help finding women who owed him money who worked at massage parlors.

At a second meeting before the trip, Huang and Shen explained to Yan how massage parlors operated. They told Yan to pose as a customer to gain access. Once inside, Yan and the others were to subdue the occupants and communicate to Shen and

Huang that the "condition is clear." Shen and Huang would then "come in to do the rest." Huang told Yan that he would be paid at least $20,000 per week.

Huang and Shen picked up Yan, Tao, and Jun Li in a white Dodge van. On the drive to Northern California, it was reiterated that the men would be collecting debts from massage parlors by force.

Yan recalled that seven or eight brothels were robbed on the trip, each robbery following a similar pattern. Huang gave Yan a gun. Shen supplied guns to Tao and Jun Li. The gun Shen provided Tao for the San Jose robbery had some type of silencer on it, but at 12 to 18 inches long and four inches in diameter, the silencer was jettisoned before the San Jose robbery as too large to fit into a backpack. Tao and Jun Li sometimes used stun guns during the robberies, which Huang had supplied. The brothel appointments were made by either Shen or Huang. At the brothels, Yan, Tao, or Jun Li would enter first, posing as customers to gain access before drawing their weapons and subduing the occupants. Huang and Shen entered later, their faces covered.[3] All five men would search the apartment for valuables, and some of the men would sexually assault the workers. Huang and Shen told Yan, Tao, and Jun Li that if they encountered resistance, they could fire a gunshot to scare the occupants; Huang and Shen suggested muffling the sound by firing against the sofa. Shen said that if anyone in the brothel were to be shot, the remaining occupants should also be killed.

Yan's account of the four charged robberies largely tracked the victims' accounts. At the Milpitas brothel, Huang raped one of the sex workers and asked Yan to get a "big object" to put inside the woman's vagina. Shen had the woman's bank card, which was used for a cash withdrawal and to purchase goods at an Apple Store. At the South San Francisco brothel, the men found two customers and subdued everyone who was inside.

---

[3] Tao and Jun Li did not wear a mask during the robberies, and Yan wore a mask only once. According to Yan, the men would not have been permitted to enter the brothels had they entered with masks first.

Huang and Shen sexually assaulted one of the women. Yan also sexually assaulted one of the women. At the Fremont brothel, Tao, Huang, and Shen sexually assaulted the women inside.

As for the San Jose robbery, Yan recalled that Shen had been to the brothel earlier and gave the group information about the location. Shen told the men to expect two women and two male "shop keepers." Shen said that the two men, if resistant, could be intimidated by gunfire. Shen reiterated that if any of the occupants were shot, the men were to kill the others inside. Shen gave Tao and Jun Li guns to use during the robbery, and Huang drove the men to the location. They found two men and two women inside the brothel, and all four were then restrained with zip ties.

One of the men tried to take off his restraints, and Yan told him not to move. But the man freed himself, jumping on top of a countertop that separated the living room and the kitchen. Tao came out of the room, and Yan saw Tao fire the gun. The man fell over into the kitchen, bloodied. The man said he would not run again, and Yan restrained him. Yan and his accomplices searched the apartment and left, taking two luggage containers, a backpack, and cigarettes.

Huang and Shen picked up Yan, Jun Li, and Tao with the van, and Shen asked if they had used the gun. Tao admitted that he had fired his gun. Shen blamed Yan, Tao, and Jun Li for not eliminating all witnesses, and Shen and Huang both seemed angry, saying "nasty words" to them. The group went to a hotel, and Huang and Shen left that night. Yan made his way back to the Los Angeles area the next day. Yan deleted the WeChat texts between him and Huang.

After their arrest, Huang gave Yan a letter that asked Yan and Tao to "plead out" to the crimes. Yan wrote back to Huang and asked for $20,000 in exchange for his testimony that Huang was "clean" and that "[e]verything was done by [Jun Li] and [Shen]."

### h. *Shen's Background*

8

In June 2015, an undercover officer with the San Gabriel Police Department called a brothel under investigation and spoke to Shen to arrange an appointment. Upon arrival at the brothel, the undercover officer met Shen, who explained the brothel's process.

The parties stipulated Shen was convicted of section 266, subdivision (f), selling a person for immoral purposes, and was placed on probation, and that Shen was still on probation in September 2017.

### 2. *Huang's Defense*

Huang testified on his own behalf. Huang was born in China to successful parents. He started working as a tour guide in the United States in 2014 and was active in a WeChat tour guide group.[4] Huang met Shen after a prior client asked for an interpreter.

Huang denied Yan's account. Huang testified that he was merely a hired tour guide and driver for Yan. According to Huang, Yan posted an advertisement that said he was looking to hire a car to go to San Francisco. Yan told Huang that two or three others would accompany him on his trip, and he wanted to visit a few friends' houses. Huang then drove a van, accompanied by Shen, and picked up Yan, Tao, and Jun Li for the trip. Huang drove Yan to various addresses provided by Yan, with Shen making reservations. Huang knew the men were visiting brothels because Shen had called and asked what the businesses were. The group visited five to seven brothels. When Huang came to pick up Yan, Jun Li, and Tao at the San Jose brothel, the men said they had to leave immediately, and Yan told Huang that someone had been shot. According to Huang, he then realized that the men had been committing robberies, and he begged Yan to let him go. Yan said that he would find and kill both Huang and Shen if they did not keep quiet. Huang and Shen later drove the van back to Los Angeles, leaving Yan, Jun Li, and Tao in Northern California.

---

[4] Several fellow tour guides testified that they knew Huang as a tour guide and believed that he was hard working and busy.

### 3. *Tao's Defense*

An expert in gunshot residue analysis and detection received a shirt associated with Tao that he sampled for gunshot residue and found no residue. But the expert acknowledged that the absence of residue could be explained by the distribution of particles other than on the sampled areas, or the loss of deposited particles before sampling.

### 4. *The Verdict and Sentencing*

In November 2022, the jury convicted all three defendants of all charges as alleged, finding true the special circumstances and enhancements. The trial court sentenced Shen and Huang to life without the possibility of parole consecutive to a determinate term of 24 years. The trial court sentenced Tao to a term of life without the possibility of parole consecutive to 67 years to life. All three defendants timely appealed.

## II. DISCUSSION

### A. *Tao's Confession*

Before trial, Tao's counsel moved to suppress his confessions from a succession of post-arrest interrogations by four different law enforcement agencies, and the trial court excluded all but the first confession, to Detective Meeker. On appeal, Tao argues that his *Miranda* waiver in this first interview was not knowing or intelligent. We find no error in the trial court's admission of Tao's confession. Despite initial mistakes in the translation of Tao's *Miranda* rights, Tao was advised fully of his rights a second time and affirmatively indicated on the record that he understood them.

### 1. *Additional Background*

The San Jose Police Department was the first agency to interrogate Tao. Tao spoke in Mandarin during the interview, and Meeker was assisted by a Mandarin interpreter, Tony LaRosa. Detective Raul Martinez also participated in the interview.

The officers started by asking Tao about his name and other information, including where he worked and whether he used WeChat. Martinez then read Tao his

10

*Miranda* rights with LaRosa interpreting. There were several issues with LaRosa's interpretation in this first advisement: When Tao was told that he had the right to remain silent, LaRosa asked Tao if he understood that right. When Tao replied, "Um," La Rosa interpreted this as "[y]es." LaRosa similarly misinterpreted as "yes" Tao's identical reply when asked if he understood his "right to speak and receive help and counsel from an attorney." When Martinez advised, "If you cannot afford an attorney, one will be appointed for you free of charge before any questioning if you want," LaRosa interpreted this in Mandarin as "if you like to have an attorney, but if you cannot afford one, the court can assign an attorney for you." This time, when asked if he understood this right, Tao answered that he did.

LaRosa then disclosed that he needed to correct the advisement about having an attorney present; Martinez instead suggested that they "start over" to ensure that Tao understood his rights. LaRosa told Tao, "[S]ince I just made a mistake, … we will say it again." In this second attempt, LaRosa interpreted the following advisements, with Tao affirmatively responding "I do" when asked if he understood each one: "You have the right - the right to remain silent"; "Otherwise, anything you say can be used against you in court"; "Prior to questioning, you have the right to speak to an attorney and receive help and counsel from the attorney. You have the right to have an attorney present during questioning"; "If you want to hire an attorney but cannot afford one, the court will appoint you one"; and "do you understand everything that was just said." The San Jose detectives then proceeded to interview Tao with LaRosa's assistance.

After the San Jose detectives concluded their interview, Fremont Detective Richard Hamblin interviewed Tao with another officer interpreting. Detective Hamblin started his interview with Tao about a minute after the San Jose interview, and the interview lasted approximately 50 minutes. During the interview, Hamblin asked Tao through the interpreter whether Tao still understood the rights that had been read to him earlier. Tao replied, first, "Um," then "Just now, they said it." Tao then said, "I don't

11

remember clearly," so Hamblin advised Tao of his rights a second time. When the interpreter told Tao in Mandarin, "If you can't afford an attorney, the court will be appointed to you [*sic*]. Do you understand?" Tao replied, "Yes. When can I hire an attorney?" Hamblin responded, "So the process is and I apologize, this is not my county, but you'll go to booking, um, you'll get an arraignment and they'll issue you, if you can't afford one, an attorney at that time."[5] In Mandarin, the interpreter rendered Hamblin's statement as follows: "I apologize this is not my county, but he just explained that sorry, this is not my county, but after you finish booking here, you will go to court, uh, to do … anyway, appearing in court. When you appear in court, the court will ask you." Hamblin did not advise Tao that he had the right to an attorney before any questioning. Hamblin then proceeded to interview Tao.

Given Hamblin's erroneous response to Tao's question about when he could obtain an attorney, the trial court excluded the statements made by Tao during this second interview and the subsequent interviews with the officers from the Milpitas and South San Francisco police departments. With respect to the San Jose interview, the trial court found that during the second recitation of Tao's *Miranda* rights as translated by LaRosa, Tao affirmatively stated that he understood his rights. The trial court acknowledged that Tao's later exchange with Hamblin and the interpreter reflected that he could not fully remember the rights that were read to him earlier. But the trial court concluded that this was not evidence that Tao's earlier waiver during the interview with San Jose officers was unknowing.

### 2. *Legal Principles and Standard of Review*

" 'As a prophylactic safeguard to protect a suspect's Fifth Amendment privilege against self-incrimination, … law enforcement agencies [must] advise a suspect, before

---

[5] Hamblin testified at the hearing that he had believed that Tao was asking about the "court process" and "how that would play out."

any custodial law enforcement questioning, that "he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires." ' " (*People v. Sauceda-Contreras* (2012) 55 Cal.4th 203, 215 (*Sauceda-Contreras*).) The prosecution " ' "bears the burden of establishing by a preponderance of the evidence that [a defendant's] waiver [of *Miranda* rights] was knowing, intelligent, and voluntary under the totality of the circumstances." ' " (*People v. Miranda-Guerrero* (2022) 14 Cal.5th 1, 16. (*Miranda-Guerrero*).) A waiver is " ' "knowing in the sense that it was 'made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it.' " ' " (*People v. Suarez* (2020) 10 Cal.5th 116, 157 (*Suarez*).)

"When evaluating the admissibility of a defendant's statements on appeal, we accept the trial court's resolution of disputed facts if supported by substantial evidence, and we independently determine from the undisputed facts and the facts properly found by the trial court whether the statements were illegally obtained." (*Miranda-Guerrero*, *supra*, 14 Cal.5th at p. 16.)

### 3. *Analysis*

Applying independent review, we find no error in the trial court's admission of Tao's statements to the San Jose detectives. Tao's unequivocal agreement when asked if he understood each of his correctly administered and translated *Miranda* rights, together with his demonstrated willingness to answer the detectives' questions about his participation in the crimes, met the prosecution's burden of showing a knowing, intelligent, and voluntary waiver. Although Tao relies on circumstances before his advisement and after his confession in urging a contrary conclusion, his arguments are unpersuasive.

Undisputedly, LaRosa initially misinterpreted both Tao's right to counsel and Tao's equivocal answers when asked if he understood his rights. (*Sauceda-Contreras*,

13

*supra*, 55 Cal.4th at p. 215 [defendant has right to appointed attorney prior to questioning].) But LaRosa acknowledged his mistake not only to the detectives but to Tao and then proceeded to accurately interpret a " ' "fully effective" ' " new *Miranda* advisement. (*Miranda-Guerrero, supra*, 14 Cal.5th at p. 17, italics omitted.) Tao clearly responded to these second advisements by stating "I do" when asked if he understood the rights being read to them. Indeed, the fact that Tao demurred when asked if he understood LaRosa's first bungled translation supports the reliability of his later affirmation that he understood the second, correct rendition.

The validity of Tao's waiver is not undermined by his contention that the San Jose police officers, before any *Miranda* advisement, misleadingly asked him about his use of WeChat and the make and model of his car under the guise of "personal data." *Miranda*'s prophylactic rule does not prevent officers from "speak[ing] freely to [an unwarned] suspect in custody provided ' "the speech would not reasonably be construed as calling for an incriminating response." ' " (*People v. McCurdy* (2014) 59 Cal.4th 1063, 1086–1087; *People v. Elizalde* (2015) 61 Cal.4th 523, 536–537 [an interrogation includes questions that the police should know is reasonably likely to produce an incriminating response].) "[R]outine booking questions and responses as to a defendant's identity and other statistical information do not render involuntary a later waiver of constitutional rights." (*People v. Honeycutt* (1977) 20 Cal.3d 150, 159.)

In this case, the pre-*Miranda* questions were largely biographical and meant to elicit certain, non-incriminating background information. We recognize that some of these pre-advisement questions may have been investigative in nature: Questions about Tao's wireless provider and his WeChat screen name appear designed for use in obtaining data from third parties about Tao's mobile phone and his communications. But Tao's claim is not that his answers to these questions—or fruits, if any, derived from his answers to them—should have been suppressed as unwarned, nor has he identified any of the pre-*Miranda* statements that were admitted against him at trial. He argues only that

14

the fact of these questions bears on the effectiveness of his express waiver. But he does not explain how these questions would reasonably be construed as calling for an incriminating response. Although a number of defendants reported using WeChat in communicating among themselves and with others, nothing in the record suggests a basis to construe the question about WeChat as calling for a response any more incriminating than an admission of using a cell phone, or social media, or any other messaging platform.[6] (See *People v. Andreasen* (2013) 214 Cal.App.4th 70, 87 ["[t]he fact that information gathered from these routine questions or casual conversations turns out to be incriminating does not alone render the statements inadmissible"].) Indeed, none of the WeChat logs were introduced at trial; nor did the trial turn on the defendants' use of mobile phones. The officers' initial colloquy with Tao did not render deficient the subsequent advisement or Tao's statement that he understood his rights.

Tao nonetheless argues that his statements during the subsequent interview by Fremont officers suggested that he had not understood his rights when he submitted to the San Jose interview. We disagree. At the outset of the Fremont police interview, Hamblin asked Tao if he "*still* underst[ood]" the rights that "they"—the San Jose officers—"read [Tao] … [b]efore"; Tao said only, "I don't remember clearly." (Italics added.) The context makes clear that Tao was communicating only that he lacked sufficient memory of the advisement to presently understand them, not that he had lacked comprehension when he expressly affirmed his understanding more than two hours earlier and submitted to interrogation by the San Jose detectives. (See, e.g., *Suarez*, *supra*, 10 Cal.5th at pp. 163, 162 [comment by defendant at end of interview that he " 'cannot understand what rights I can have' " did not alter conclusion that defendant had validly waived rights the day prior when defendant told officers he understood his rights, signed a *Miranda*

---

[6] As Yan explained, WeChat is popularly used in China and among Chinese Americans.

form, and had no questions].)[7]  Nor does Tao's asking Hamblin when he could hire an attorney call into question his understanding in the prior interview.  Tao's question to Hamblin about hiring an attorney followed his third advisement that he had a right to *appointed* counsel at no cost.  The timing of Tao's question thus suggests that he wished to explore the logistics of retaining counsel.

We note as well that Tao may have been asking for clarification from Hamblin of the discrepancy between the translation of Hamblin's rendition of the *Miranda* warning and what Tao had heard LaRosa accurately translate in the interview with San Jose police:  Unlike the San Jose officers, Hamblin never readvised Tao that he had the right to counsel "before any questioning."  Hamblin in his answer to Tao's query compounded this omission by suggesting that the soonest Tao could consult with counsel would be after his arraignment.  But this mistake goes to the trial court's exclusion of Tao's statements to Hamblin, not Tao's duly advised waiver in speaking earlier with the San Jose detectives.  Nothing in Tao's later exchange with the Fremont officer supports an inference that in his earlier interrogation by San Jose police, he did not understand that he could remain silent or that his right to counsel could be exercised before any questioning commenced.

Nor does Tao's experience as a recent immigrant from China require a different conclusion.  A defendant's background is a relevant consideration in determining whether a waiver is knowing and intelligent (*Suarez*, *supra*, 10 Cal.5th at p. 160), and Tao argues that he had limited understanding of the American legal system, given that criminal defendants in China have no right to remain silent.  But Tao was advised of his rights by

_____

[7] *Suarez* is factually distinguishable in that the interviewer responded by having the defendant confirm that he had understood his rights when he waived them.  (*People v. Suarez*, *supra*, 10 Cal.5th at p. 163.)  But the logic of *Suarez* is persuasive—a defendant's ambiguous post-waiver statements do not necessarily undermine the validity of the waiver when made.

LaRosa in his native tongue, Mandarin, and LaRosa's second advisement informed him of his right to remain silent. Not only did Tao affirm that he understood each right, but he also said nothing to suggest a contrary understanding of their meaning, whether informed by knowledge of Chinese law or any other circumstance. The California Supreme Court has repeatedly held that a defendant's ignorance of the legal system does not necessarily detract from the validity of an express waiver. (See *Miranda-Guerrero*, *supra*, 14 Cal.5th at pp. 17–19 [rejecting claim that defendant's waiver was unknowing due to his relative youth, limited education, lack of experience with the American legal system, and his difficulty understanding English]; *People v. Leon* (2020) 8 Cal.5th 831, 841 [finding a defendant's *Miranda* waiver to be knowing even though defendant claimed his knowledge of the legal system "came mainly from Mexican soap operas"]; see also *Suarez*, *supra*, 10 Cal.5th at p. 160 [that defendant spent his whole life " 'working in fields or pastures' " did not render him "incapable of understanding his rights"].) Nothing in the record affords us a basis to deviate from these authorities.

In our independent judgment, the undisputed facts before the trial court reflected that Tao then understood his rights before being questioned by the San Jose detectives. Therefore, Tao's express affirmation that he understood his rights and his willingness to answer the officers' subsequent questions constituted a valid waiver. (See *Suarez*, *supra*, 10 Cal.5th at p. 158.) The trial court thus did not err in admitting his confession at trial.

## B.   *Instructional Error*

The prosecutor proceeded under the theory that Tao was guilty of first degree felony murder as the actual killer. On appeal, Tao argues that the jury instructions erroneously permitted the jury to convict him as the actual killer even if he only proximately caused Xingjian Li's death but did not personally kill him.[8] Although we

---

[8]Although Tao did not object to the instructions in the trial court, "failure to object to instructional error will not result in forfeiture if the substantial rights of the defendant are affected." (*People v. Mitchell* (2019) 7 Cal.5th 561, 579 (*Mitchell*); § 1259.)

agree that the instructions were flawed, the sole theory pursued at trial was that Tao fired the fatal gunshot. Accordingly, any instructional error was harmless beyond a reasonable doubt.

### 1. *Additional Background*

At trial, the jury was instructed on the theory of first degree murder for an actual killer for Tao as follows: "To prove that a defendant is guilty of first degree murder under this theory, the People must prove that: [¶] 1. The defendant committed Robbery, as charged in Count 2; [¶] 2. The defendant intended to commit Robbery; [¶] AND [¶] 3. While committing Robbery, the defendant caused the death of another person." The instructions specified that "[a] person who was the actual killer may be guilty of felony murder even if the killing was unintentional, accidental, or negligent." Further, "[i]t is not required that the person die immediately, as long as the act causing death occurred while the defendant was committing the Robbery." The jury was instructed on causation that an act "causes death if the death is the direct, natural, and probable consequence of the act and the death would not have happened without the act. A natural and probable consequence is one that a reasonable person would know is likely to happen if nothing unusual intervenes."

The jury was also instructed on the elements of the enhancement that Tao had personally and intentionally discharged a firearm, which required the jury to find that Tao "personally discharged a firearm during the commission of that crime," that he "intended to discharge the firearm," and that his "act caused the death of a person." The instruction on the personal use enhancement explained that "[a]n act *causes death* if the death is the direct, natural, and probable consequence of the act and the death would not have happened without the act. A *natural and probable consequence* is one that a reasonable person would know is likely to happen if nothing unusual intervenes. In deciding whether a consequence is natural and probable, consider all the circumstances established by the evidence."

18

During closing argument, the prosecutor reiterated that Tao was guilty of felony murder as the actual killer. Echoing the instructions, the prosecutor argued that the third element of felony murder as the actual killer required that the jury find that "while committing the robbery Lin Tao caused the death of another person." The prosecutor argued that Tao could be guilt of felony murder even if the killing was "unintentional, accidental or negligent." And as for the intentional discharge allegation, the prosecutor again argued that the jury was required to find that "Lin Tao caused the death of another person."

### 2. *Analysis*

We review de novo "whether the [jury] instruction accurately states the law" and "whether there is a reasonable likelihood that the trial court's instructions caused the jury to misapply the law in violation of the Constitution." (*Mitchell*, *supra*, 7 Cal.5th at p. 579.) Tao correctly notes that an actual killer liable for felony murder under section 189, subdivision (e)(1) must be the one who personally inflicts the fatal act. (*People v. Garcia* (2020) 46 Cal.App.5th 123, 152 (*Garcia*) [actual killer under § 190.2, subd. (b) is the one who "personally kills the victim"]; *People v. Lopez* (2022) 78 Cal.App.5th 1, 4 [actual killer under § 189, subd. (e)(1) "refers to someone who personally killed the victim and is not necessarily the same as a person who 'caused' the victim's death"]; *People v. Vang* (2022) 82 Cal.App.5th 64, 91 (*Vang*) [accord].) The instructions here—for felony murder and the special circumstance alike[9]—did not make this clear. Instructions like those at issue here have been found flawed to the extent they permit a jury to find a defendant guilty of felony murder as the actual killer "based on general causation principles." (*Garcia*, at p. 156, fn. 33; *Vang*, at p. 91.)

---

[9] The special circumstance instruction did not define actual killer, though it specified that an actual killer need not have acted with an intent to kill or with reckless indifference to human life.

19

But despite the omission of a correct "actual killer" definition in the instructions, however, reversal is not required because the error was harmless. When jury instructions permit a guilty verdict under both valid and invalid legal theories, reversal is required unless "after examining the entire cause, including the evidence, and considering all relevant circumstances, [we] determine[] the error was harmless beyond a reasonable doubt." (*People v. Aledamat* (2019) 8 Cal.5th 1, 13 (*Aledamat*) [applying prejudice standard of *Chapman v. California* (1967) 386 U.S. 18 to alternative-theory instructional error].) Under this standard, we " 'examine[] what the jury necessarily did find and ask[] whether it would be impossible, on the evidence, for the jury to find *that* without *also* finding the missing fact as well.' " (*In re Lopez* (2023) 14 Cal.5th 562, 592.) "[I]f ' "[n]o reasonable jury that made all these findings could have failed to find" ' the facts necessary to support a valid theory, the alternative-theory error was harmless." (*Ibid.*)

Here, the jury found true the enhancement under section 12022.53, subdivision (e)—a finding Tao does not challenge—and thus found beyond a reasonable doubt that Tao personally and intentionally discharged a firearm. The jury's finding means it necessarily found that Tao personally killed Li, as the evidence at trial established that Xingjian Li died from a single gunshot wound. Because only one act caused Li's death and because there is no dispute that Tao was the one who committed that act, no reasonable jury could have found that Tao *caused the death* of Li by firing his gun without *also* finding that he personally committed the fatal act—the firing of the gun.[10] (*People v. Birdsall* (2022) 77 Cal.App.5th 859, 871 [any rational juror would have found

---

[10] In contrast, both *Garcia* and *Vang* involved evidence from which the jury could have concluded that the defendant did *not* personally kill the victim but instead committed some other act—passing duct tape to an accomplice who taped the victim's mouth (*Garcia*, *supra*, 46 Cal.App.5th at p. 150), or committing the kidnapping, causing the victim to jump out of a vehicle to escape (*Vang*, *supra*, 82 Cal.App.5th at pp. 79–80))—that in turn proximately caused the victim's death. (See *Garcia*, at pp. 156–157 [asphyxia]; *Vang*, at p. 91 [traumatic injury].)

the defendant to have personally killed victim when the evidence was that the victim was killed by an attack where defendant and accomplice "jointly strangled" victim to death].)

Because the instructional error here is harmless beyond a reasonable doubt, reversal is not required.  (*Aledamat*, *supra*, 8 Cal.5th at p. 13.)

## C.  *Sufficiency of the Evidence for Huang's Murder Conviction and Special-Circumstance Allegation*

Under the current iteration of the felony-murder statute, a nonkiller accomplice to the commission of an enumerated felony that results in death may be liable for murder if the accomplice was a major participant in the underlying felony and acted with reckless indifference to human life.  (§ 189, subd. (e); *People v. Strong* (2022) 13 Cal.5th 698, 710 [observing that § 189 as amended "codifie[s] the understanding of those requirements elucidated in [*People v. Banks* (2015) 61 Cal.4th 788 (*Banks*)] and [*People v. Clark* (2016) 63 Cal.4th 522 (*Clark*)]"].)  Likewise, for those who are not the actual killer, the felony-murder special circumstance can be found true only if the person aids or abets the murder with the intent to kill or aids an abets the underlying felony as a major participant who acted with reckless indifference to human life.  (§ 190.2, subds. (c) & (d).)

On appeal, Huang challenges his murder conviction and special circumstance on the theory that insufficient evidence supported the determination that he was a major participant in the underlying robbery who acted with reckless indifference to human life.[11]  We disagree and find that sufficient evidence supports his conviction.

---

[11] The felony-murder rule applies only if a death occurs during the perpetration of certain enumerated felonies, including robbery.  (§ 189, subds. (a) & (e).)  The prosecutor was thus required to prove that Xingjian Li was killed during the perpetration of a robbery to establish liability under the felony-murder rule.  Huang does not challenge whether there was sufficient evidence of an underlying robbery.

## 1. *Major Participation*

Whether an accomplice is a major participant in an underlying felony turns on circumstances including: "What role did the defendant have in planning the criminal enterprise that led to one or more deaths?  What role did the defendant have in supplying or using lethal weapons?  What awareness did the defendant have of particular dangers posed by the nature of the crime, weapons used, or past experience or conduct of the other participants?  Was the defendant present at the scene of the killing, in a position to facilitate or prevent the actual murder, and did his or her own actions or inaction play a particular role in the death?  What did the defendant do after lethal force was used?" (*Banks, supra*, 61 Cal.4th at p. 803, fn. omitted.)  The Supreme Court has clarified that "[n]o one of these considerations is necessary, nor is any one of them necessarily sufficient," and that all the factors may be weighed to determine whether the defendant was a major participant.  (*Ibid.*)

To be sure, Huang was not present when Xingjian Li was killed; according to Yan, Huang and Shen were still waiting outside when Tao fired the fatal shot.[12]  He thus was in no immediate position to prevent the shooting or to render aid.  (See *Banks*, *supra*,

---

[12] In support of his claim of insufficient evidence, Huang argues in part that Yan's accomplice testimony was not corroborated as section 1111 requires.  But even if corroboration were inadequate, "[e]vidence erroneously admitted is properly considered in weighing the sufficiency of evidence to support a conviction, notwithstanding its erroneous admission." (*People v. Navarro* (2021) 12 Cal.5th 285, 311.)  More importantly, ample independent evidence corroborated Yan's testimony—S.D.'s testimony about the man who both raped her and used an eggplant to penetrate her vagina, Huang's fingerprint on a condom wrapper at the Milpitas brothel, Huang's semen in the van, and the surveillance videos linking the defendants and the van Huang rented.  Section 1111 does not require independent corroboration of every facet of an accomplice's testimony; independent evidence is sufficiently corroborating if it so connects the defendant to the crime such that a jury may reasonably find the accomplice to be truthful.  (See *People v. Davis* (2005) 36 Cal.4th 510, 543.)

61 Cal.4th at p. 803, fn. 5.)  But there is ample evidence from which a jury could infer that Huang was nonetheless a major participant in the robbery.

Yan testified that Huang was the one who posted the job advertisement that led to the brothel robberies, and Yan characterized both Huang and Shen as the leaders of the group.  Yan testified that Huang had told him that the women they intended to rob owed him money and that the robberies would take place in massage parlors.  Further, Yan testified that Huang was the driver and that both Huang and Shen made the arrangements to visit the brothels.  Other evidence corroborated that Huang was in a leadership position, as he was the one who rented the van from Yue.  There was thus substantial evidence that Huang had a significant role in planning the string of underlying robberies, one of which ultimately led to Xingjian Li's death, and that he was actively involved in carrying out his own plans.  (*Banks*, *supra*, 61 Cal.4th at p. 803; *People v. Rodriguez* (2021) 66 Cal.App.5th 749, 769–770 (*Rodriguez*) [evidence sufficient to show defendant was major participant when he was obviously part of ongoing conspiracy to commit armed robberies].)

There was also evidence that Huang supplied the guns or at least had control or access over them.  (*Banks*, *supra*, 61 Cal.4th at p. 803.)  Yan testified that Huang gave him a gun to use during the robberies and that Huang also gave Tao and Jun Li stun guns.  And there was evidence that Huang knew of the potential dangers of the robbery, given that he was present when Shen told Yan, Tao, and Jun Li that all witnesses should be killed if any of the men had to use their firearms.  (See *In re Harper* (2022) 76 Cal.App.5th 450, 463 (*Harper*) [petitioner's knowledge that plan was to either kill or subdue manager suggested major participation].)

Furthermore, there was evidence that Huang knew of Yan's background as a police officer and former member of the Chinese military—and, given the robberies that preceded the shooting in San Jose, which involved the use of force and sexual assaults perpetrated against the sex workers by the men—a jury could reasonably infer that Huang

was aware that his accomplices would not shrink from violence and were willing to use force.

Finally, Huang's actions after the fatal act further suggested that he was a major participant. (*Banks*, *supra*, 61 Cal.4th at p. 802.) After Tao shot Xingjian Li, Huang drove Yan, Tao, and Jun Li away from the scene, and Tao told Huang and Shen that he had fired his gun. Yan testified that Shen and Huang both seemed angry, saying "nasty words" to the rest of the men, rather than expressing concern or attempting to alert the authorities to help the victim. (See *Harper*, *supra*, 76 Cal.App.5th at p. 462 [failure to assist victim weighed in favor of finding major participation]; *People v. Montanez* (2023) 91 Cal.App.5th 245, 280.)

Taken together, the foregoing is substantial evidence to support the jury's determination that Huang was a major participant in the underlying robbery.

### 2. *Reckless Indifference*

In *Clark, supra*, 63 Cal.4th 522, the California Supreme Court addressed the mental state of reckless indifference to human life, holding that it comprises both subjective and objective components. (*Id.* at p. 617; *People v. Emanuel* (2025) 17 Cal.5th 867, 884 (*Emanuel*).) "The subjective element" of reckless indifference "is the defendant's conscious disregard of [known] risks"; its objective element considers "what 'a law-abiding person would observe in the actor's situation.' " (*Clark*, at p. 617.) " 'Awareness of no more than the foreseeable risk of death inherent in any [violent felony] is insufficient' to establish reckless indifference to human life; 'only knowingly creating a "grave risk of death" ' satisfies the statutory requirement." (*In re Scoggins* (2020) 9 Cal.5th 667, 677, quoting *Banks*, *supra*, 61 Cal.4th at p. 808; *Emanuel*, at p. 884.) Factors to be considered include: (1) a defendant's knowledge of weapons, use of weapons, and number of weapons; (2) a defendant's physical presence at the crime and opportunities to restrain the crime and/or aid the victim; (3) the duration of the crime; (4) a defendant's knowledge of a cohort's likelihood of killing; and (5) a defendant's

efforts to minimize the risks of violence during the felony.[13]  (*Clark*, at pp. 618–622; *Scoggins*, at p. 677 [applying *Clark* factors].)  Like the factors considered in *Banks*, " '[n]o one of these considerations is necessary, nor is any one of them necessarily sufficient.' "  (*Clark*, at p. 618.)

As with the *Banks* factors, we recognize that some *Clark* factors do not support a finding of reckless indifference to human life.  Huang was not physically present at the San Jose brothel when Xingjian Li was shot; he thus had no opportunity to restrain Tao.  (*Emanuel*, *supra*, 17 Cal.5th at p. 889.)  There is also little to suggest that the duration of the San Jose robbery itself was particularly long.  (*Emanuel*, at p. 886 [prolonged crime creates " ' "greater window of opportunity for violence" ' "].)

But several of the other *Clark* factors support the finding of reckless indifference.  As discussed in our analysis of the *Banks* factors, there was evidence that Huang knew that his accomplices were armed, as Yan testified that it was Huang who handed him a gun to use.  A defendant's "awareness that a firearm will be used in the commission of the underlying felony is … significant."  (*Rodriguez*, *supra*, 66 Cal.App.5th at pp. 771–772.)

And as described *ante*, there was evidence that Huang knew of his codefendants' likelihood to kill and use violence.  (*Emanuel*, *supra*, 17 Cal.5th at p. 885.)  Xingjian Li was killed after the defendants had already engaged in *several* armed robberies of brothels, during which gratuitous violence was used against the sex workers and customers.  There was testimony that Huang himself participated in the rape, sexual assault, and sexual humiliation of the earliest charged robbery and that he was present

---

[13] The high court in *Clark* acknowledged "the interrelationship" between major participation in an underlying felony and reckless indifference to human life.  (*Clark*, *supra*, 63 Cal.4th at p. 614.)  The two requirements significantly overlap, " 'for the greater the defendant's participation in the felony murder, the more likely that he acted with reckless indifference to human life.' "  (*Id.* at p. 615.)  But these two requirements still require individual consideration.  (*Id.* at p. 616.)

and aware that his codefendants also engaged in sexual assault. And although he had undisputed control of the van, he continued to participate in the succeeding robberies.

Furthermore, Huang's lack of effort to minimize the risk of violence weighs in favor of a finding of reckless indifference. (*Emanuel*, *supra*, 17 Cal.5th at p. 887.) There was evidence that Huang and his accomplices were aware that they would encounter resistance at the San Jose brothel. (Cf. *Banks*, *supra*, 61 Cal.4th at p. 811 [nothing in the record to suggest a likelihood of resistance and to need to meet resistance with lethal force]; *Emanuel*, at p. 896 [lethal force was used when met with "unexpected resistance," which did not suggest reckless indifference to human life].) Yan testified that Shen had been to the San Jose brothel earlier and had reported back to the group that they should expect two men who were managing the brothel. The group was undeterred, and Tao, Jun Li, and Yan went to the brothel armed. (Cf. *Emanuel*, at p. 887 [need to minimize risk of violence less pressing if no weapons are used].) The evidence thus suggested that Huang knew that he was undertaking more than a " ' "garden-variety armed robbery" ' " of unsuspecting sex workers and that the crime would involve at least several men who were trafficking the women. (*Id.* at p. 884.) This " 'elevated the risk to human life beyond those risks inherent in any armed robbery.' " (*Id.* at p. 895.) Indeed, resistance appeared to be anticipated—Yan testified that Shen reiterated to the men multiple times—in Huang's presence—that if anyone in the brothel was shot, the rest of the men were to kill the remaining witnesses. (See *Emanuel*, at p. 885.)

Finally, Huang's actions after the shooting also suggest reckless indifference. While none of the men made good on Shen's proposal to kill all witnesses, Huang neither rendered aid nor sought medical intervention once told someone had been shot; instead, he drove the men away from the scene and eventually fled to Southern California. (*In re Loza* (2017) 10 Cal.App.5th 38, 54 [failure to stop or render aid to victims suggests reckless indifference].) Huang argues that it was unclear whether Xingjian Li was seriously injured. But a jury could reasonably infer that Yan and the others on leaving

26

the brothel told Huang of the shooting, and that Huang would also know from their customary use of restraints that the other occupants of the brothel would be unable to render aid.

Based on the totality of the circumstances, substantial evidence thus supports the jury's determination that Huang acted with reckless indifference to human life.

**D.** *Admission of Expert Testimony on Firearm Toolmark Comparison*

At trial, over defendants' objection, criminalist Matthew Riles testified that the firearm manufacturing process gives each gun certain " 'individual characteristics' " that will leave marks like scratches and impressions on fired bullets. Even when two guns are manufactured in succession with the same tooling methods and no intervening sharpening of the machinery, Riles testified that it is possible to determine to "a practical certainty" which gun fired a given bullet Comparing a bullet test-fired from the gun recovered from Shen's home to the fired shell casing found at the San Jose brothel, Riles opined that the "agreement" between the test-fired bullet and the fired shell casing was "significant enough" to suggest that they were fired from the same gun. Comparing the test-fired bullets with the bullet retrieved from Xingjian Li's body, Riles believed there was sufficient "agreement of the[] stria" to conclude that the bullets were fired from the same firearm. Shen and Huang argue on appeal that firearm toolmark comparison is not generally accepted within the scientific community and is subject to exclusion, notwithstanding *People v. Cowan* (2010) 50 Cal.4th 401, under *Sargon Enterprises, Inc. v. University of Southern California* (2012) 55 Cal.4th 747 (*Sargon*) and Evidence Code section 802.

We need not address whether the trial court erred in admitting the expert testimony, because the admission of Riles's testimony was harmless. It is not reasonably probable that Shen and Huang would have received a more favorable verdict absent the error. (*People v. Jones* (2013) 57 Cal.4th 899, 939–940; see also *People v. Azcona* (2020) 58 Cal.App.5th 504, 528 (conc. opn. of Greenwood, P. J.) [applying *People v.*

27

*Watson* (1956) 46 Cal.2d 818, 836 (*Watson*) standard of prejudice to claim of *People v. Kelly* (1976) 17 Cal.3d 24 and *Sargon* error].)[14]

Even without the testimony on firearm toolmarks, there was overwhelming evidence that the nine-millimeter handgun used to kill Xingjian Li was under Shen's control, and that both Shen, like Huang, had a leadership position in the scheme. Yan testified that it was Shen who gave the firearm to either Tao or Jun Li. Live nine-millimeter ammunition was found inside Shen's home, and the ammunition found in Shen's home matched the headstamp from the gun casing collected from the San Jose shooting. Shen's DNA was also found on the butt of the gun.

Nor did the prosecution case against Shen depend on identifying the gun recovered from his home as the source of the fatal gunshot. Yan testified at length about how Shen and Huang planned the robberies. Shen's documented prior human trafficking experience also gave credence to Yan's testimony that Shen and Huang planned the brothel robberies. Surveillance videos also circumstantially corroborated Yan's account of all the appellants' involvement: Officers were able to determine that the five suspects all stayed at the Motel 6 in San Jose on September 25, 2017, and the Wyndham hotel in San Jose on September 28, 2017, the day of the shooting in San Jose; that Shen was with

---

[14] Shen argues that we should reverse unless the putative error was harmless beyond a reasonable doubt, on the theory that permitting a verdict based on the expert's improper facts or inferences lessened the prosecutor's burden of proof in violation of his constitutional right to due process of law. But " 'even erroneous admission of evidence does not offend due process unless it is so prejudicial as to render the proceeding fundamentally unfair.' " (*People v. Covarrubias* (2011) 202 Cal.App.4th 1, 20; *People v. Albarran* (2007) 149 Cal.App.4th 214, 229 [a trial may be rendered fundamentally unfair if there are no permissible inferences to be drawn from the evidence and the evidence is " ' "of such quality as [to] necessarily prevent[] a fair trial" ' "].) Riles's toolmark analysis was not the linchpin of the prosecution's case, or even the prosecution's strongest evidence linking Shen's armory to the fatal gunshot. We accordingly cannot conclude that Riles's testimony rendered the trial fundamentally unfair. (See *Covarrubias*, at pp. 20–21.)

28

Huang and the others carrying luggage resembling that taken from the San Jose brothel; and that Shen after the Milpitas incident was at the Apple store in Palo Alto where S.D.'s bank card was used. Shen's DNA was also found on the Wyndham parking pass recovered from the van. And at the scene of the Milpitas incident, officers found a Bank of America receipt that had two of Huang's fingerprints, one of Shen's fingerprints, and two of S.D.'s fingerprints.

And with respect to the San Jose incident, Y.G. identified Shen as having visited the brothel the day before the robbery, further corroborating Yan's account of Shen's role in scouting target locations and supplying intelligence on what to expect on entry.

In sum, the firearm toolmark testimony added little to the overall weight of the evidence that corroborated Yan's testimony and implicated Shen as a leader of the group who not only supplied the firearm Tao used in the San Jose shooting but instructed the crew to kill as needed. The admission of expert testimony was therefore harmless as to Shen because it is not reasonably probable that he would have received a more favorable verdict in the absence of error. (*Watson*, *supra*, 46 Cal.2d at p. 836.)

We likewise conclude that any error would have been harmless as to Huang, as Huang's sole argument on prejudice is that the toolmark evidence bolstered the prosecution theory that Shen supplied the gun, which in turn bolstered Yan's testimony that Huang and Shen planned the robberies. Given the ample evidence corroborating Yan's testimony about the leadership role of both Shen and Huang, it is not reasonably probable that Huang would have received a more favorable verdict in the absence of any assumed error. (*Watson*, *supra*, 46 Cal.2d at p. 836.)

E.      *Admission of Evidence of Automotive Filters*

At trial, over Shen's objection, the prosecutor introduced photographs of the automotive oil filters found in Shen's bedroom. The firearms expert, Riles, testified that an oil filter can function as a "low[-]cost … DIY … suppressor [for] a firearm" that would avoid "federal tax to ATF" and "certain background checks." Shen now argues on

appeal that the trial court erred by admitting evidence of the filters and by further admitting expert testimony about how silencers can be made from them. Because the oil filters were a relevant link between Shen's weaponry and the San Jose shooting, and because its probative value was not substantially outweighed by any undue prejudice, the trial court did not err in admitting the evidence.

Only relevant evidence is admissible. (Evid. Code, § 350.) Relevant evidence is that having a "tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action." (*Id.*, § 210.) But "[a] trial court may exclude otherwise relevant evidence when its probative value is substantially outweighed by concerns of undue prejudice, confusion, or consumption of time." (*People v. Scott* (2011) 52 Cal.4th 452, 490 (*Scott*); Evid. Code, § 352.) Evidence is unduly prejudicial under Evidence Code section 352 " ' "when it is of such nature as to inflame the emotions of the jury, motivating them to use the information, not to logically evaluate the point upon which it is relevant, but to reward or punish one side because of the jurors' emotional reaction." ' " (*Scott*, at p. 491.) But unless the dangers of undue prejudice *substantially outweigh* the evidence's probative value, the trial court should overrule an objection under Evidence Code section 352. "On appeal, we review the trial court's ruling on the admissibility of evidence for abuse of discretion." (*Scott*, at p. 491.)

Here, the oil filter evidence was relevant and probative as to the disputed issues at trial—Shen's role in the robberies and his connection to the gun Tao used in San Jose. (See Evid. Code, § 210.) Because Yan had testified that the gun Shen provided Tao had been equipped with a type of silencer before the silencer was rejected as too large to be practicable, Shen's possession of oil filters that could be used for a silencer supported an inference that he was in fact the one who provided the gun to Tao. Furthermore, that Shen was found with the gun and the silencer-making materials in his home supports the inference that the gun was his, further demonstrating the extent to which he may have had a leadership or organizational role in planning the offenses.

30

Shen nonetheless argues that the evidence was not probative because Yan described the silencer at trial as resembling a water bottle, not an oil filter. But Shen misconstrues the evidence—Yan testified the silencer during interviews as approximately the size of a water bottle because the officers had used the water bottle as a size reference when getting his statement. Yan did not previously state that the silencer *was* a water bottle or was shaped like one.

Shen alternatively argues that the oil filter evidence was unnecessary to prove his possession of an assault weapon (§ 30605), because an assault weapon includes a semiautomatic pistol with "[a] threaded barrel, *capable of* accepting a flash suppressor, forward handgrip, or silencer" (§ 30515, subd. (a)(4)(A), italics added), even if no such accoutrements are in fact attached to the barrel. But the prosecutor is not limited to the minimum quantum of evidence to support the charges. That evidence of the oil filters was not strictly necessary to prove that the gun was an assault weapon does not render the evidence irrelevant. (See, e.g., *People v. Mills* (2010) 48 Cal.4th 158, 191 [trial court does not abuse discretion solely by admitting evidence that is not strictly necessary to prove the People's case].) Moreover, evidence that oil filters were found in Shen's home was not probative solely as to the charge of possession of a firearm. The evidence was *also* probative as to Shen's role in the robberies, which bore on whether he was a major participant who acted with reckless indifference to human life.

Finally, the probative value of the evidence was not substantially outweighed by its potential for prejudice. There is little about the oil filter evidence that would evoke an emotional reaction from the jury. (*Scott*, *supra*, 52 Cal.4th at p. 491.) The admission of the evidence did not consume an undue amount of time—the oil filters were introduced photographically, and the statements by the investigating officer and Riles about the use of oil filters as makeshift silencers were relatively brief. (See Evid. Code, § 352.) The trial court thus did not exceed the bounds of reason by concluding that the evidence was admissible under Evidence Code section 352.

**F.**     *Second Amendment Challenge*

Tao challenges his conviction for possession of an assault weapon, arguing that section 30605 is unconstitutional under the Second Amendment.  Section 30605 criminalizes possession of an assault weapon, which is further defined under section 30515, subdivision (a)(4)(A) to include a semiautomatic pistol that has a threaded barrel.[15]  But to succeed in making his facial challenge, Tao must " 'void the statute as a whole by showing that " 'no set of circumstances exists under which the [a]ct would be valid,' *i.e.*, that the law is unconstitutional in all of its applications." ' " (*In re T.F.-G.* (2023) 94 Cal.App.5th 893, 911.) " '[T]he "minimum" our cases have accepted is a showing that the statute is invalid "in the *generality or great majority* of cases." ' " (*Ibid.*)  We conclude that Tao's facial challenge under the Second Amendment fails.  (See *People v. Bocanegra* (2023) 90 Cal.App.5th 1236 (*Bocanegra*); *People v. Crenshaw* (2025) 116 Cal.App.5th 1169 (*Crenshaw*); *People v. McCowan* (2026) 117 Cal.App.5th 1071 (*McCowan*).)

### 1.   *The Second Amendment*

The Second Amendment provides that "[a] well regulated Militia, being necessary to the security of a free State, the right of the people to bear Arms, shall not be infringed."  (U.S. Const., 2d Amend.)  In other words, the Second Amendment confers "an individual right to keep and bear arms."  (*District of Columbia v. Heller* (2008) 554 U.S. 570, 595 (*Heller*).)

Recent jurisprudence from the United States Supreme Court has clarified the scope of the Second Amendment.  In *Heller*, the United States Supreme Court considered

---

[15] The Attorney General argues that Tao has forfeited his claim for failing to raise it in the trial court.  But Tao's facial challenge to the statute "requires us to 'consider "only the text of the measure itself, not its application to the particular circumstances of an individual," ' " and is thus not forfeited by a failure to object below.  (*People v. Anderson* (2024) 104 Cal.App.5th 577, 583–584; *In re Sheena K.* (2007) 40 Cal.4th 875, 889.)

the constitutionality of a law that banned handgun possession in the home and required "any lawful firearm in the home be disassembled or bound by a trigger lock." (*Id.* at p. 628.) The high court concluded that the law was unconstitutional because it "amount[ed] to a prohibition of an entire class of 'arms' that is overwhelmingly chosen by American society" for the lawful purpose of self-defense, which was "central to the Second Amendment right." (*Ibid*.) But *Heller* also cautioned that "right secured by the Second Amendment is not unlimited." (*Id.* at p. 626.) And that nothing in its holding "should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms." (*Id.* at pp. 626–627.)

Following *Heller*, the United States Supreme Court decided *New York State Rifle & Pistol Assn., Inc v. Bruen* (2022) 597 U.S. 1 (*Bruen*), which extended *Heller* to recognize "an individual's right to carry a handgun for self-defense *outside* the home." (*Bruen*, at p. 10, italics added.) *Bruen* also set forth a framework for evaluating whether a firearm regulation violates the Constitution: "When the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. The government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation. Only then may a court conclude that the individual's conduct falls outside the Second Amendment's 'unqualified command.' " (*Id.* at p. 24.) *Bruen* thus "requires courts to assess whether modern firearms regulations are consistent with the Second Amendment's text and historical understanding." (*Id.* at p. 26.)

Courts have generally interpreted *Bruen* as enacting a two-step burden-shifting framework where the party challenging the firearms regulation bears the initial burden on the first step and the government bears the burden on the second step. (*Rocky Mountain Gun Owners v. Polis* (10th Cir. 2024) 121 F.4th 96, 113; *Bevis v. City of Naperville*

(7th Cir. 2023) 85 F.4th 1175, 1194; see *Bruen*, *supra*, 597 U.S. at p. 24.) In step one, *Bruen* considered whether the individuals challenging the regulation were a part of " 'the people' " that the Second Amendment protects, whether the weapons at issue are in " 'in common use' " today for self-defense, and whether the Second Amendment protects the individual's "proposed course of conduct." (*Bruen*, at pp. 31–32.) And in step two, *Bruen* considered whether the challenged regulation was "consistent with this Nation's historical tradition of firearm regulation." (*Id.* at pp. 33–34.)

Despite *Bruen*'s analysis—which considered whether the weapons at issue were in "common use" in the first step—there has been some dispute in the lower courts as to whether the "common use" analysis is properly considered at *Bruen*'s first or second step. (*Duncan v. Bonta* (9th Cir. 2025) 133 F.4th 852, 866, fn. 2 [" '[t]here is no consensus on whether the common-use issue' is a threshold, textual inquiry or a historical inquiry"]; see *Bruen*, *supra*, 597 U.S. at pp. 31–32.) Nonetheless, several courts have concluded that the common-use analysis properly lies in *Bruen* step one. (See *United States v. Alaniz* (9th Cir. 2023) 69 F.4th 1124, 1128 [placing common-use analysis in first step]; *Nat. Assn. for Gun Rights v. Lamont* (D.Conn. 2023) 685 F.Supp.3d 63, 88; *McCowan*, *supra*, 117 Cal.App.5th at p. 1094 ["the common-use requirement is to be assessed at the first *Bruen* step, as it goes to the scope of the right, rather than to whether the regulation at issue is constitutionally permissible"].) We follow these cases, as well as the plain text of *Bruen*, which considered the common-use analysis at step one: Logically, the firearms at issue must be in common use today for self-defense, otherwise the "plain text" of the Second Amendment would not protect an individual's conduct. (*Bruen*, at p. 24.)

### 2. *Analysis*

Applying the principles laid out above, Tao is unsuccessful in his Second Amendment challenge because he has not met his burden to demonstrate that a semiautomatic pistol with a threaded barrel is a weapon in common use such that the Second Amendment's plain text applies. (See *Bruen*, *supra*, 597 U.S. at p. 24.)

The predecessor statute to section 30605, section 12280, was enacted by the Legislature in 1989 as part of the Roberti-Roos Assault Weapons Control Act of 1989 (Stats. 1989, ch. 19, § 3). (*People v. James* (2009) 174 Cal.App.4th 662, 676 (*James*).) The law was enacted in response to "[t]he crisis created by the proliferation and use of assault weapons." (*Kasler v. Lockyer* (2000) 23 Cal.4th 472, 482.) And in enacting the legislation, the Legislature stated at former section 12275.5 and presently in section 30505 that "the proliferation and use of assault weapons pose a threat to the health, safety, and security of all citizens of this state." (§ 30505, subd. (a).) In response to this threat, the Legislature chose to "restrict[] the assault weapons specified in Section 30510 based upon finding that each firearm has such a high rate of fire and capacity for firepower that its function as a legitimate sports or recreational firearm is substantially outweighed by the danger that it can be used to kill and injure human beings." (*Ibid.*) In 1999 amendments to the law, the Legislature "took a third approach to designating assault weapons—defining them in [former] section 12276.1, subdivision (a) in terms of generic characteristics." (*Kasler*, at p. 478; see Stats. 1999, ch. 129, § 7, pp. 1805–1806.) Former section 12276.1 is the predecessor to section 30515, which further defines an assault weapon to include a semiautomatic pistol that has a threaded barrel. (§ 30515, subd. (a)(4)(A).)

Relevant here, multiple cases have considered section 30605 and its predecessor statute, former section 12280, subdivision (b), and have found that various semiautomatic assault weapons are not protected by the Second Amendment. (See *James*, *supra*, 174 Cal.App.4th at p. 676 [Second Amendment "does not protect the right to possess assault weapons or .50-caliber BMG rifles"]; *People v. Zondorak* (2013) 220 Cal.App.4th 829, 836 ["ban on AK series rifles does not impinge on rights protected by the Second Amendment"].) Three post-*Bruen* cases have similarly rejected Second Amendment challenges to section 30605's prohibition on assault weapons. (*Bocanegra*, *supra*, 90 Cal.App.5th at p. 1250 [assault weapons like the AR-15 style rifle are "dangerous and

35

unusual weapons"]; *Crenshaw*, *supra*, 116 Cal.App.5th at p. 1179 [§ 30605 does not violate U.S. Const., 2d Amend.]; *McCowan*, *supra*, 117 Cal.App.5th at p. 1094 [defendant failed to demonstrate assault weapons are commonly used today for self-defense].)

First, in *Bocanegra*, the Third District rejected an as-applied challenge to section 30605 at *Bruen* step one, concluding that "the Second Amendment's plain text does not cover defendant's conduct" as weapons like the AR-style rifle found in the defendant's car were not " 'weapons … typically possessed by law-abiding citizens for lawful purposes.' " (*Bocanegra*, *supra*, 90 Cal.App.5th at p. 1250.)

Second, in *Crenshaw*, *supra*, 116 Cal.App.5th at page 1178, the First District rejected a facial challenge to section 30605, observing that the defendant failed to present "any cognizable evidence or empirical support for his claim that the assault weapons banned by section 30605 are in common use." (*Crenshaw*, at p. 1178.) In particular, *Crenshaw* noted that the defendant's argument "requires the development of a more robust factual record, particularly on the prevalence of the gun at issue here," as appellate courts typically only consider the evidence in the record. (*Id*. at pp. 1178–1179.) Thus the inquiry before the *Crenshaw* court—whether the assault weapon at issue is one commonly used for self-defense—"is not an inquiry that turns on the review of abstract and generalized legal concepts," rendering the court "not well suited to address this constitutional challenge on appeal for the first time." (*Id.* at p. 1179.)

And most recently in *McCowan*, the First District again rejected a facial challenge to several firearm regulations, including section 30605. (*McCowan*, *supra*, 117 Cal.App.5th at p. 1091.) The defendant in *McCowan* cited to "two news articles and several federal court cases" for the proposition that "assault weapons are not unusual" because of their popularity among Americans. (*Id.* at p. 1094.) But the *McCowan* court declined to rely on these factual conclusions absent evidence in the appellate record that assault weapons were indeed popular. (*Ibid*.) Further, the defendant did not present *any*

evidence about the objective characteristics of assault weapons or their common uses; thus, the First District held that it could not find that assault weapons were not particularly dangerous. (*Id.* at p. 1095.)

We see no reason to deviate from the precedents unanimously rejecting facial challenges to section 30605's prohibition on assault weapons. Without citation to any authority or any evidence, Tao offers only the conclusory argument that a semiautomatic pistol with a threaded barrel as defined under section 30515, subdivision (a)(4) is covered by the Second Amendment because "[s]uch a weapon is no more dangerous or unusual than the pistols" discussed in *Heller* and *Bruen.* Tao then distinguishes semiautomatic pistols with a threaded barrel from semiautomatic assault rifles such as AK-47's and AR-15's, which courts have found to be "dangerous and unusual." (*Bocanegra*, *supra*, 90 Cal.App.5th at p. 1250; *Rupp v. Bonta* (C.D.Cal. 2024) 723 F.Supp.3d 837.)[16] But Tao's arguments about whether a semiautomatic pistol with a threaded barrel is commonly used for self-defense is not one that is *solely* reliant on an analysis of either section 30515, subdivision (a)(4)'s or section 30605's text. And because this issue was not developed below, there is nothing in the appellate record that can guide our analysis. Nor has Tao provided evidence about the common use of semiautomatic pistols with a threaded barrel and whether these weapons *are* used for self-defense. On this record, we cannot adequately assess whether Tao has met his burden on *Bruen* step one. That AK-47's and AR-15's are distinguishable from the weapon at issue here does not automatically render such weapons commonly used for self-defense.

Thus, Tao's constitutional challenge necessarily fails at the first step of the *Bruen* analysis. And because he has not met his burden to satisfy *Bruen* step one, we need not

---

[16] In *Miller v. Bonta* (S.D.Cal. 2023) 699 F.Supp.3d 956, a federal district court held that section 30605 violates the Second Amendment. (*Id.* at pp. 1010–1011.) The district court then issued an order enjoining section 30605's enforcement. But the Ninth Circuit stayed the order pending appeal, and the appeal is currently in abeyance.

consider his additional argument that the government failed to establish that the prohibition of semiautomatic pistols with a threaded barrel is consistent with the United States' historical tradition of firearm regulation. (See *Bruen*, *supra*, 597 U.S. at p. 24.)

## G. *Restraining Orders*

Shen, Huang, and Tao argue that three of the protective orders issued by the trial court under section 136.2 exceeded the court's authority and should be vacated. We accept the Attorney General's concession that the protective errors must be vacated. The trial court issued protective orders for multiple victims in this case, including Y.G., Guo, and Y.W. But restraining orders under section 136.2 are authorized only for victims of certain specified offenses including certain domestic violence crimes, sexual offenses like rape, gang-related crimes, or crimes requiring registration as a sex offender. As neither Y.G., Guo, or Y.W. are victims of an enumerated crime, the trial court lacked jurisdiction to issue these orders (*People v. Robertson* (2012) 208 Cal.App.4th 965, 996), and issuance of a restraining order in excess of jurisdiction can be corrected at any time (*People v. Ponce* (2009) 173 Cal.App.4th 378, 381–382). We therefore strike the three restraining orders protecting Y.G., Guo, and Y.W. as to each defendant.

## H. *Clerical Error*

Lastly, Shen argues that the abstract of judgment contains a clerical error and erroneously indicates the trial court "stayed" the punishment on the special circumstance. The Attorney General concedes that this is a clerical error that this court can correct. (*People v. Mitchell* (2001) 26 Cal.4th 181, 185–188.) We agree that this error requires correction and that the abstract of judgment should be modified to reflect that the punishment on the special circumstance was not stayed.

## III. DISPOSITION

The protective orders issued against defendants for victims Guo, Y.G., and Y.W. are stricken as to all defendants. As to Shen, the trial court is directed to modify Shen's abstract of judgment to delete the notation that the punishment for the robbery-murder

38

special circumstance (Pen. Code, § 190.2, subd. (a)(17)) was stayed, and a modified abstract of judgment shall be forwarded to the Department of Corrections and Rehabilitation.  The judgments are otherwise affirmed.

_____

LIE, J.

WE CONCUR:

_____

GROVER, Acting P. J.

_____

DANNER, J.

*People v. Shen et al.*
H051141